Filed 2/19/21  P. v. McCright CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>MICHAEL McCRIGHT,<br><br>    Defendant and Appellant. | D076476<br><br><br>(Super. Ct. No. SCD278853) |

APPEAL from a judgment of the Superior Court of San Diego County, Amalia L. Meza, Judge.  Affirmed.

Matthew Aaron Lopas, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina, Annie Featherman Fraser, and Kelley Johnson, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant Michael McCright appeals the trial court's denial of his motion under Penal Code section 1018[1] to withdraw his guilty plea to one count of manufacturing THC extract (Health & Saf. Code, § 11379.6, subd. (a)).  We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

On October 2, 2018, numerous heavily armed agents from various state and federal law enforcement agencies executed search warrants directed at McCright.  The agents found extensive evidence of marijuana cultivation activities throughout his residence, property, and a vehicle.

Most notably, agents found in McCright's bedroom an electric burner (or hotplate), a wok-style frying pan with residue, and a credit or debit card with similar residue.  In a detached garage, the agents found several bottles of isopropyl alcohol.  The agents believed McCright was using the hotplate, wok, and isopropyl alcohol to manufacture THC extract.

In McCright's kitchen, agents found a refrigerator filled with loose marijuana, marijuana stalks, and a blender containing marijuana and a liquid solution.

Agents also found more than one dozen firearms, with ammunition, throughout the residence.

McCright told agents the marijuana was legal, the firearms belonged to his roommates, and that he never touched the firearms.

---

[1]     Undesignated statutory references are to the Penal Code.

2

McCright was arrested and charged with manufacturing THC extract. (Health and Saf. Code, § 11379.6, subd. (a).)[2] It was further alleged McCright had sustained two strike priors stemming from convictions for robbery and attempted robbery in Washington state.

Two weeks after initially pleading not guilty, McCright entered into a plea bargain under which he agreed to plead guilty to manufacturing THC extract and to admit one strike prior. In exchange, the prosecution agreed to (1) a six-year sentence (the low term, doubled for the strike prior); (2) not charge McCright with child endangerment (his one-year-old daughter sometimes stayed with him); (3) not charge McCright's father in connection with this incident and to return any seized firearms registered in the father's name;[3] and (4) allow McCright to withdraw his guilty plea if federal authorities charged him for the same incident.

The trial court accepted McCright's guilty plea. But before the sentencing hearing, McCright retained new counsel and moved to withdraw his guilty plea, arguing it resulted from ineffective assistance of counsel, ignorance, and duress. The prosecution opposed the motion, and the trial court denied it.

---

[2] Health and Safety Code section 11379.6, subdivision (a) states: "Except as otherwise provided by law, every person who manufactures, compounds, converts, produces, derives, processes, or prepares, either directly or indirectly by chemical extraction or independently by means of chemical synthesis, any controlled substance specified in Section 11054, 11055, 11056, 11057, or 11058 shall be punished by imprisonment . . . for three, five, or seven years . . . ."

[3] Other than the fact the father's firearms were found in McCright's possession, it is unclear from the appellate record how the father would have been implicated in the drug charge.

The court later sentenced McCright to six years in prison.

## DISCUSSION

## I. Denial of Motion To Withdraw Guilty Plea

McCright asserts three challenges to the trial court's order denying his motion to withdraw his guilty plea. First, he contends he received ineffective assistance from his plea counsel because she failed to investigate the factual and legal bases for the charge, and failed to provide McCright with the information necessary to make an informed choice. Second, and relatedly, McCright contends he was "operating under mistake and ignorance" because counsel failed to make him aware of a potentially meritorious defense, failed to provide all relevant discovery, and failed to provide search warrant materials that may have disclosed a viable suppression issue to litigate. Finally, McCright maintains his plea was obtained under duress caused by the circumstances of his arrest, the limited time he had to consider the prosecutor's plea offer, and "empty inducements" intended to sweeten the deal. We conclude the court did not err.

## A. Background

## 1. McCright's Guilty Plea

On October 4, two days after his arrest, McCright was arraigned and pleaded not guilty. The court appointed the public defender's office to represent him, and set a readiness conference for October 16, and a preliminary hearing for October 18.

At the readiness conference, the prosecutor offered a plea bargain with a 10-year sentence, which McCright declined.

On the day of the preliminary hearing, the prosecutor reduced his offer to six years, which McCright accepted after further negotiation.

4

The plea bargain was documented in a change of plea form, which McCright completed with assistance from deputy public defender Angela Turner (sometimes referred to in the record as Angela Shimizu). The form confirmed McCright was pleading guilty to one count of manufacturing THC extract, and admitting one strike prior (for attempted robbery). As the factual basis, the form specified McCright "unlawfully manufactured THC extract." McCright initialed a box next to text on the form stating, "I am entering my plea freely and voluntarily, without fear or threat to me or anyone closely related to me." He signed the form under penalty of perjury, swearing that he "read, understood, and initialed each item [in the form], and everything on the form . . . is true and correct." Turner also signed the form, attesting she had "personally read and explained . . . the entire contents of th[e] plea form" to McCright, and had "discussed [with him] all charges[,] . . . possible defenses . . . , and the consequences of th[e] plea."

Before accepting his plea, the trial court reviewed the change of plea form with McCright, including by confirming that he was entering his plea "freely and voluntarily without fear or threat because [he] believe[d] it's in [his] best interest." Regarding his guilty plea, McCright acknowledged he was guilty of "unlawfully manufactur[ing] a controlled substance, to wit THC extract honey oil in violation of Health and Safety Code section 11379.6, subdivision (a)." He similarly acknowledged his prior conviction for attempted robbery in Washington constituted a strike prior under California law. The court and McCright then had the following colloquy about the factual basis for the guilty plea:

> "THE COURT: And the factual basis for your plea is the following: That you unlawfully manufactured THC extract. Is that what you did, sir?
>
> "[McCright]: I accept the plea of guilty.

5

"THE COURT: No, I'm asking you, is that what you did, yes or no? Yes or no?

"[McCright]: I accept the agreement.

"THE COURT: Okay. Listen carefully to my question.

"[McCright]: Yes, yes.

"THE COURT: Yes?

"[McCright]: Yes.

"THE COURT: Okay. That's what you did, unlawfully manufacture THC extract? Yes?

"[McCright]: Well, I'm telling you, it's up for debate, but I'm accepting the plea.

"THE COURT: Well, sir, we are not here to debate.

"[McCright]: I'm not here to debate either, ma'am.

"THE COURT: You're either going to plea or we're going to go forward with the preliminary hearing, so just answer the questions. If you can't answer my questions because you want to debate it, then we'll have a hearing.

"[McCright]: Well, I just received some new information from my lawyer, so—

"THE COURT: All right. Is that what you did, yes or no?

"[McCright]: Yes."

The court confirmed with Turner that she "concur[red] in the waiver of rights, the factual basis, and the defendant's plea." The court then accepted McCright's guilty plea and strike admission, finding his plea was "knowingly, voluntarily and intelligently entered," and that "there [was] a factual basis." The court set sentencing about five weeks out.

## 2. The Plea Withdrawal Papers

Before the sentencing hearing, McCright retained new counsel (motion counsel) and moved to withdraw his guilty plea. McCright argued in the

6

motion that his guilty plea was not knowingly and voluntarily made because Turner had not (1) provided him all discovery files; (2) provided him the search warrant affidavits, which might have shown a viable suppression issue to litigate; or (3) adequately researched or discussed a potentially meritorious defense based on McCright's claimed use of the wok to prepare legal edibles and ointments. McCright further argued his guilty plea resulted from duress caused by the limited time he had to consider the plea offer, and the prosecutor's threat to add a count for child endangerment. McCright maintained many of these issues also constituted or arose from ineffective assistance from Turner.

The prosecution opposed McCright's motion and detailed the evidence that would have been presented at the preliminary hearing, had McCright not pleaded guilty first. One of McCright's roommates told agents that although he never saw McCright cooking marijuana, McCright told him "he was using a burner to cook the marijuana" in his bedroom and "would use the burners to evaporate the alcohol in order to reduce the marijuana." The roommate also reported that McCright had once offered him a vial of marijuana resin.

An agent who was an expert in methods for manufacturing THC extract would have explained the significance of the evidence recovered from McCright's residence. For example, agents recovered "a substantial amount of shake," which "is the remnant, or crumbs, that fall off the marijuana flower." Shake contains little THC, so it has little value to a typical marijuana user, but it is "a commodity for those who extract THC." Thus, based on his training and experience, the agent would have opined that "the only reason to have marijuana shake is to extract THC."

The agent would also have explained that isopropyl alcohol is "commonly used" as a solvent "in THC extraction" by combining it with marijuana shake and heating the combination on a hotplate until the alcohol evaporates, leaving marijuana resin. The agent thus deemed it significant that (1) McCright had a wok and hotplate in his bedroom; (2) the wok and a nearby credit card, which "is not a cooking utensil," had resin on them; and (3) there were multiple bottles of isopropyl alcohol, which "people generally don't buy several bottles of."

Other witnesses would have testified that McCright had a one-year-old daughter who sometimes spent the night in his bedroom. The agent/expert would have testified that "[m]anufacturing THC extraction is a dangerous process" that involves "highly flammable" chemicals and vapors that "linger in the air." The agent would also have opined that if McCright's daughter ingested the concentrated THC extract "it surely could have caused [her] great bodily injury."

### 3. Plea Withdrawal Hearing and Ruling

The trial court conducted a thorough, two-day evidentiary hearing at which McCright and Turner testified.

***McCright's Testimony***

McCright testified that even before his arrest in this case, he did not trust law enforcement or the government. He believed the FBI was stalking him; authorities thought he was a terrorist; a detective had flown to Seattle to get the mother of one of McCright's children to "say something . . . bad about" him; and authorities "would stake out" his visitations with a son who was in the CPS system.

McCright said that for medical reasons he was permitted to grow 99 marijuana plants and to possess 11 pounds of dry cannabis. He claimed he

8

used the hotplate and wok in his bedroom to cook marijuana edibles.

Regarding Turner's performance, McCright testified he first met with her for 10 or 15 minutes the day before the readiness conference. She gave him "incomplete discovery" that was missing information about the search warrants, and contained no photographs of the wok or isopropyl alcohol bottles. McCright found out only later that there were no lab results for the residue in the wok. During this meeting, McCright and Turner did not discuss the elements of the charged offense, or whether McCright used the wok to prepare marijuana edibles. Nevertheless, Turner told McCright "there's no real defense here."

McCright saw Turner again the next day at the readiness conference. The prosecutor offered McCright a plea bargain with a 10-year sentence, but McCright rejected it.

McCright next met with Turner two days later at the preliminary hearing, at which Turner explained a few witnesses would testify against McCright. At some point, Turner told McCright the prosecutor had dropped the offer to six years, but warned that if McCright did not take the deal, the prosecutor would add a child endangerment charge.

McCright testified he "felt kind of trapped" because he knew that if there are drug allegations and children are around, "it could be problematic" and he thought "they might try to take [his] kid because [he] already [has] a kid in CPS." Although he denied his daughter was ever in the bedroom when marijuana was present, McCright felt "kind of forced" to take the six-year deal because he feared losing her. He also felt pressured by the government's history of "harassing" him.

Before the lunch break, McCright told Turner he needed more time to consider the offer and wanted to discuss it with his family. Turner responded

that she "doesn't have time for this," and gave McCright only 10 minutes to decide. After the lunch break, McCright again expressed his desire for more time, but Turner would not request a continuance.

McCright ultimately accepted the offer. He said he did not tell the court during the plea hearing that he felt coerced because Turner kept rushing him and telling him to "shut up." Additionally, the judge was getting frustrated and said they would simply proceed with the preliminary hearing if McCright did not accept the offer. McCright knew he was facing more time if he did not take the six-year offer, and he did not want to see his daughter uprooted.

On cross-examination, McCright acknowledged he had a lengthy criminal history, which included at least 14 guilty pleas in Washington, and a juvenile case in San Diego.

### Turner's Testimony

Turner testified she was assigned to McCright's case after his arraignment, and met with him three times before he entered his guilty plea—before the readiness conference, at the readiness conference, and the day of the preliminary hearing (which became the plea hearing).

During their first meeting, Turner gave McCright a copy of his discovery, which they "discussed . . . in summary." The main things that stood out to Turner were the wok and bottles of isopropyl alcohol found at McCright's residence. Turner and McCright also reviewed the jury instruction for the single charge, and went over the allegations in the police reports. Based on their discussion, Turner and McCright "agreed that there didn't appear to be a strong defense to the case." McCright authorized Turner to seek a plea deal with a sentence of up to 16 months.

At the readiness conference, Turner proposed the authorized deal, but the prosecution rejected it. Turner met with McCright and they again discussed the facts of the case. Later that day, the prosecution offered McCright a 10-year deal, which McCright rejected.

Turner and McCright met again the morning of the preliminary hearing. Sometime that morning, the prosecutor reduced his plea offer to six years, and indicated he was considering adding a child endangerment charge if the case proceeded. McCright wanted more time to consider the offer, which Turner thought was reasonable. So, at 10:36 a.m., Turner sent a text message to the prosecutor requesting a continuance. The prosecutor declined the request and indicated the offer was only good for that day. Turner did not request a continuance from the court because, based on her experience, she did not expect that the prosecutor would keep the six-year offer open after having prepared for the preliminary hearing.

McCright was "hesitant about taking the deal," but "was also very afraid of getting more time on this case." By noon, he had decided to accept the offer, but there was not enough time to put the plea on the record before the court's lunch break.

The case was called sometime after 1:30 p.m. Turner explained she did not request a continuance from the court during the plea hearing because "McCright said that he wanted to take the deal, and [they] went through the forms together, and . . . had spent a lot of time talking about it." Turner denied she ever told McCright to "shut up" or that he had only 10 minutes to consider the offer.

McCright and Turner never discussed whether he used the wok for the legal activity of making edibles.

11

Turner acknowledged that although she had handled drug offenses before, this was her first case involving manufacturing THC extract. She was "[n]ot specifically" "familiar with the fundamentals of THC extraction," was "vaguely" familiar with the differences between using butane and isopropyl alcohol as a solvent in the extraction process, and was unfamiliar with what "a closed loop system is." To prepare for the case, she reviewed the pertinent jury instructions, spoke about the facts of the case with two other deputy public defenders who had taken similar cases to trial, and obtained from those colleagues transcripts of expert testimony from other extraction cases.

Turner addressed several of McCright's accusations regarding the adequacy of her preparation. For example, although she acknowledged the discovery materials she provided to McCright did not include search warrant materials, she and McCright "definitely" discussed possible suppression grounds. Additionally, although the discovery did not include lab test results for the wok residue, Turner explained to McCright that the prosecution's deadline for producing discovery had not yet expired, and "it's . . . commonplace . . . to have to make decisions . . . before you get the complete discovery."[4] Finally, although Turner acknowledged she had not investigated the potential child endangerment charge, she recalled seeing references in the discovery to the fact McCright's daughter was in the home on many occasions, and Turner "had many other cases where prosecutors . . . charge[d] child endangerment for the mere presence of child when there's any criminal activity going on.

---

[4] On this point, McCright attached to his motion an email from the prosecutor explaining that the prosecution team "didn't go forward with testing the wok residue since [McCright] plead guilty."

12

### Ruling

During argument, the trial court interjected to offer several observations about how there "was nothing out of the ordinary" about McCright's plea proceeding. For example, the court explained that because "a lot of cases resolve . . . pre-prelim," when the defendant can "get a better deal," defense counsel are not required to conduct extensive investigation at "[t]hat stage of the proceedings . . . . They get the discovery, and they meet with their clients, and they give them their advice . . . ." The court also observed that adding child endangerment charges is "legally permissible" and "happen[s] all the time."

The court then delivered its ruling, finding McCright had not met his burden to withdraw his guilty plea. The court found McCright failed to prove ineffective assistance of counsel because although "it would have been nice" for Turner to "have done all of these things" McCright complained of, "it's not required." The court also noted the strength of the prosecution's case.

The court found McCright had not met his burden to show coercion or duress because he had "extensive" experience with the criminal justice system. The court also noted McCright "had more time than most people usually have to consider the offer."

Finally, the trial court noted McCright had "stated in the plea form that his plea was 'freely and voluntarily made without fear or threat to me or anyone closely related to me' "; he reviewed the plea form with his counsel; and the court "carefully went through the change of plea with" McCright before "finding that his plea was freely and voluntarily made."

## B. Legal Principles

### 1. Plea Withdrawal

"A trial court may allow a defendant to withdraw his or her guilty or no contest plea under section 1018 for good cause . . . ." (*People v. Archer* (2014) 230 Cal.App.4th 693, 702 (*Archer*); see § 1018;[5] *People v. Patterson* (2017) 2 Cal.5th 885, 894; *People v. Breslin* (2012) 205 Cal.App.4th 1409, 1415-1416 (*Breslin*).) "To establish good cause . . . , the defendant must show by clear and convincing evidence that he or she was operating under mistake, ignorance, or any other factor overcoming the exercise of his or her free judgment, including inadvertence, fraud, or duress." (*Breslin*, at p. 1416; see *Patterson*, at p. 894; *Archer*, at p. 702.) "The defendant must also show prejudice in that he or she would not have accepted the plea bargain had it not been for the mistake" or other relevant factor. (*Breslin*, at p. 1416.)

However, a "defendant may not withdraw a plea because the defendant has changed his or her mind." (*Archer*, *supra*, 230 Cal.App.4th at p. 702; see *People v. Knight* (1987) 194 Cal.App.3d 337, 344 ["buyer's remorse . . . is not sufficient"].) Even "[t]he fact [a defendant] may have been persuaded, or was reluctant, to accept the plea is not sufficient to warrant the plea being withdrawn." (*People v. Ravaux* (2006) 142 Cal.App.4th 914, 919.)

We review a ruling on a plea withdrawal motion for an abuse of discretion, and defer to the trial court's factual findings if they are supported by substantial evidence. (*Breslin*, *supra*, 205 Cal.App.4th at p. 1416.)

---

5    Section 1018 states in pertinent part:  "On application of the defendant at any time before judgment . . . , the court may, . . . for a good cause shown, permit the plea of guilty to be withdrawn and a plea of not guilty substituted."

## 2. Ineffective Assistance of Counsel

A defendant "is entitled to effective assistance of counsel in determining whether to accept or reject a plea bargain." (*Archer*, *supra*, 230 Cal.App.4th at p. 707; see *Breslin*, *supra*, 205 Cal.App.4th at p. 1418.) "To show denial of that right, a defendant must show: (1) his or her counsel's performance was below an objective standard of reasonableness under prevailing professional norms; and (2) the deficient performance prejudiced the defendant." (*Breslin*, at p. 1418.) " '[T]o satisfy the "prejudice" requirement, the defendant must show that there is a reasonable probability that, but for counsel's errors, [the defendant] would not have pleaded guilty and would have insisted on going to trial.' " (*Id.* at p. 1419.) A defendant's " 'self-serving' " assertion of prejudice is insufficient—the assertion " 'must be corroborated independently by objective evidence.' " (*Id.* at p. 1421.) The defendant bears the burden of proving an ineffective assistance claim by a preponderance of the evidence. (*Id.* at p. 1418; see *Archer*, at p. 707.)

A reviewing court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. [Citation.] Tactical errors are generally not deemed reversible, and counsel's decisionmaking must be evaluated in the context of the available facts. [Citation.] To the extent the record on appeal fails to disclose why counsel acted or failed to act in the manner challenged, we will affirm the judgment unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation." (*People v. Maury* (2003) 30 Cal.4th 342, 389 (*Maury*).)

## C. Analysis

### 1. Ineffective Assistance and Ignorance/Mistake

We address together McCright's claims of ineffective assistance of counsel and ignorance/mistake because they are essentially two sides of the same coin—McCright maintains Turner's ineffective assistance caused him to operate under ignorance and mistake.

One key aspect of McCright's appellate challenge is his claim that Turner failed to become sufficiently "acquainted with the specifics of THC extraction before advising him that he had no real defense to that charge," which caused him to be "unaware that he had a potentially meritorious defense" based on his claim he was merely preparing legal marijuana edibles. We are not persuaded.

It bears emphasizing that McCright pleaded guilty only 16 days after his arrest. In that time, Turner met with him three times; reviewed the discovery, investigative files, and the elements of the offense and pertinent jury instructions; spoke with several colleagues who had taken similar claims to trial; and obtained transcripts of expert testimony about manufacturing THC extract. Under these circumstances, we agree with the trial court that this was sufficient investigation for a plea entered so early in the case. (See *Maury*, *supra*, 30 Cal.4th at p. 389 ["counsel's decisionmaking must be evaluated in the context of the available facts"].)

To support his claim of inadequate investigation, McCright cites the fact Turner was unfamiliar with the "closed loop extraction" process that McCright contends was at issue in *People v. Bergen* (2008) 166 Cal.App.4th 161. But the phrase "closed loop extraction" appears nowhere in the *Bergen*

opinion.[6]  Moreover, whereas the extraction process described in *Bergen* used butane as the solvent and filters as the method for separating the THC from the solvent (*id.* at p. 166), the prosecution expert here would have testified that McCright was using a different extraction process that used isopropyl alcohol as the solvent and heat as the method for separating the THC from the solvent.

We find similarly unpersuasive McCright's assertion that Turner did not adequately research how far along the extraction process had to be for McCright to be held criminally liable.  Turner reviewed with McCright the applicable jury instruction, which states:  "The People do not need to prove that the defendant completed the process of manufacturing or producing a controlled substance.  Rather, the People must prove that the defendant knowingly participated in *the beginning or intermediate steps* to process or make a controlled substance."  (CALCRIM No. 2330, italics added.)  McCright cites no authority to suggest that this requirement was not satisfied by his possession of the necessary ingredients and instruments for manufacturing THC extract—large quantities of marijuana shake and isopropyl alcohol, a hotplate, and a wok.  (See, e.g., *People v. Lancellotti* (1993) 19 Cal.App.4th 809, 812-813 [affirming conviction under Health & Saf. Code, § 11379.6 where the defendant stored all necessary ingredients for manufacturing methamphetamine in a storage locker and a prosecution expert opined "the contents of the storage locker were being used to manufacture

---

6     Our own searches of the Westlaw and Lexis databases yielded no published California opinions in which the phrase "closed loop extraction" appears.

methamphetamine"].)[7]  Beyond McCright's mere possession of the necessary ingredients and instruments, the prosecution expert was prepared to testify that the presence of residue on the wok and credit card indicated McCright had, in fact, manufactured THC extract.

Another key aspect of McCright's appellate challenge is his contention that Turner was ineffective because she "did not research case law or discuss the defense of cooking marijuana for legal consumption versus illegally extracting THC."  He further contends this ineffective assistance caused him to be unaware of a viable defense.  We are not persuaded in either respect.

" 'The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information.' [Citation.]  Thus, a defendant can hinder counsel's investigation not only through affirmative statements, but also by remaining silent or failing to disclose pertinent information to counsel.  [Citation.] Whether a defendant's statements or nondisclosures have hindered trial counsel's investigation depends upon the circumstances of each case." (*In re Crew* (2011) 52 Cal.4th 126, 148 (*Crew*).)

Under the circumstances of *this* case, McCright has not established that Turner was ineffective for failing to discuss edibles with him because he

_____

[7]     It appears from the record that when McCright made this argument to the trial court, he based it solely on an unpublished Court of Appeal decision, which the trial court noted was uncitable and, in any event, distinguishable. Turner, likewise, correctly testified she "wouldn't be able to rely on" the unpublished opinion "as mandatory."  (See Cal. Rules of Court, rule 8.115(a).)

gave her no indication it was a potentially relevant defense. McCright was sophisticated enough about marijuana law to tell the law enforcement agents executing the search warrants that he was legally entitled to possess marijuana. Yet, he never told Turner he was using the wok and hotplate to prepare marijuana edibles. Moreover, for such a defense to have been viable, McCright would have to establish that he used the wok and hotplate *exclusively* for preparing edibles. But, as the trial court observed, the prosecution made a strong showing that McCright was using the wok and hotplate, *at a minimum*, to manufacture THC extract—he possessed large quantities of marijuana shake and isopropyl alcohol useful only for extraction, the residue on the wok and credit card was consistent with THC extract, he once offered his roommate a vial of marijuana resin, and he previously told his roommate "he was using a burner to cook the marijuana" in his bedroom and "would use the burners to evaporate the alcohol in order to reduce the marijuana."

In the face of substantial evidence showing that McCright was manufacturing THC extract, and absent any indication from McCright that he was *only* preparing marijuana edibles, Turner was not ineffective for failing to independently research or suggest an edibles-based defense. (See *Crew, supra*, 52 Cal.4th at p. 148.) Further, the trial court's observations regarding the strength of the prosecution case indicate the court reasonably found McCright had not proved by clear and convincing evidence that he would not have pleaded guilty had Turner raised the topic of edibles.[8]

---

[8] McCright suggests the trial court's discussion of the strength of the prosecution case indicates the trial court imposed an unduly high burden on him. We disagree. The court prefaced its ruling by identifying section 1018 as the controlling statute and reciting its governing standard. We are thus satisfied the trial court understood and applied the correct standard.

Relatedly, McCright faults Turner for failing to bring to his attention the fact the discovery files did not include photographs of the wok or any lab analysis of the residue found in it. But Turner provided the files to McCright, and the absence of photographs and lab results was self-evident. Additionally, McCright owned the wok and would not have needed photographs to be familiar with its appearance or contents.

Further, as to the absence of lab results, Turner testified she explained that the prosecution's deadline for producing discovery had not yet expired, and "it's . . . commonplace . . . to have to make decisions . . . before you get the complete discovery." Additionally, it may have behooved McCright to plead guilty before the prosecution completed its lab analysis of the residue and eliminated all doubt as to its nature. Indeed, McCright acknowledges in his briefing that Turner "presented what appeared to be a tactical decision" for not "determin[ing] the nature of . . . the substance on the wok." "Tactical errors are generally not deemed reversible . . . ." (*Maury*, *supra*, 30 Cal.4th at p. 389.)

To the extent McCright now suggests Turner was ineffective for failing to obtain her own expert analysis of the wok residue, McCright has not met his burden of supporting the claim with evidence establishing that the results of the analysis would have been favorable to him. (See *People v. Lucas* (1995) 12 Cal.4th 415, 448, fn. 5 [defendant claiming ineffective assistance based on the failure to consult an expert witness "must do more than surmise that defense expert[ ] *might* have provided more favorable testimony"].)

McCright contends Turner was also ineffective for failing to "investigate potential defenses to the threatened child endangerment charge." We disagree. Generally speaking, child endangerment occurs when a "person . . . having the care or custody of any child . . . willfully causes or

20

permits that child to be placed in a situation where his or her person or health is endangered." (§ 273a, subd. (a).) The prosecution expert was prepared to testify that exposing a child to concentrated THC extract or the chemicals produced during the extraction process could be dangerous. Turner testified that, in her experience, it was not uncommon for prosecutors to add child endangerment charges whenever children are present during criminal activity, and Turner saw numerous references in the discovery to the fact McCright's daughter sometimes stayed in his bedroom. The trial court likewise observed that adding child endangerment charges is "legally permissible" and "happen[s] all the time." And even McCright testified he knew "it could be problematic" and thought "they might try to take [his] kid," even though he maintained his "daughter was never present at the time [he] had marijuana products or things in [his] room."

Other than raising factual disputes about whether McCright was manufacturing THC extract and whether his daughter was ever present when he "had marijuana products or things" in his room, McCright fails to identify any potential defenses he contends additional investigation would have revealed. Nor has he met his burden to show he would not have pleaded guilty but for Turner's alleged insufficient investigation—McCright was "very afraid of getting more time on this case," and the prosecutor actually *reduced* his settlement offer from 10 years to six years at the same time he mentioned the possibility of adding a child endangerment charge. Thus, McCright has not shown that Turner's failure to further investigate the potential child endangerment charge constituted prejudicially ineffective assistance, or that the trial court abused its discretion by denying his motion.

As another instance of alleged ineffective assistance, McCright cites the fact Turner admittedly neglected to provide him with the search warrant

21

affidavits, which might have disclosed "a viable suppression issue to litigate," such as the possibility the warrants were issued based solely on the fact McCright was legally cultivating marijuana. We are not persuaded. First, this assertion is entirely speculative; presumes the magistrate who issued the warrants was ignorant of the legality of cultivation activities; and ignores the fact that federal authorities were also involved in the investigation and that growing marijuana is illegal under federal law. Second, Turner testified she was aware McCright was authorized to grow a certain amount of marijuana, and she and McCright "definitely" discussed potential suppression issues. Third, McCright has not shown that the affidavits, which are not in the appellate record, would have disclosed any viable suppression issues to litigate.

Finally, McCright faults Turner for failing to explain that, in light of the prosecutor's refusal to agree to a continuance or to extend the six-year offer, McCright could have bypassed the prosecutor, requested a continuance from the court, and simply pleaded "to the sheet."[9] But nothing in the record indicates McCright communicated to Turner that he was unhappy with the prosecutor's conduct in the plea negotiations and wanted to cut him out of the bargaining process. And, more importantly, it is entirely speculative, uncorroborated, and doubtful that McCright—who had previously rejected a 10-year settlement offer and was "very afraid of getting more time on this case"—would have risked losing a *guaranteed* six-year deal from the prosecutor, when that was the *best* sentence (the low term, doubled for the

---

[9]    A " 'plea to the sheet' " is "a guilty plea to all charges filed in a case, with no prior agreement regarding the sentence to be recommended to the judge." (Graham, *Crimes, Widgets, and Plea Bargaining: An Analysis of Charge Content, Pleas, and Trials* (2012) 100 Cal. L.Rev. 1573, 1589, fn. 90.)

admitted strike prior) he could have received from the trial court. Given the trial court's observation that McCright had an extensive criminal history, and the fact that by pleading to the sheet McCright would have admitted two strike priors, he ran a very realistic risk of receiving sentence of at least 10 years (the middle term, doubled)—which he previously rejected. Under these circumstances, McCright's uncorroborated assertion that he would have rolled the dice for a chance to obtain—at best—the same sentence he was guaranteed under the plea bargain is insufficient to establish he received ineffective assistance or that he was operating under mistake or ignorance. Accordingly, the trial court did not abuse its discretion in denying his motion.

## 2. Duress

McCright also contends the trial court abused its discretion in denying his motion because his guilty plea was obtained under duress. We are not convinced.

McCright argues he entered his plea under the duress caused by the show of force exhibited during his arrest, to which he was particularly vulnerable in light of his preexisting distrust of the government. However, more than two weeks had elapsed between the time of his arrest and his guilty plea, and McCright cites no additional intervening allegedly coercive act.

McCright also argues that the limited time he had to consider the prosecutor's six-year offer caused him to act under duress. But whereas McCright testified he had only 10 minutes to consider the offer, Turner disputed his claim and asserted he had several hours to consider the offer, which is corroborated by Turner's 10:36 a.m. text message to the prosecutor. Moreover, the offer was a continuation of plea negotiations that began several days earlier. All this led the trial court to observe that McCright had

23

"more time than most people usually have to consider [the] offer." McCright has not shown that the trial court abused its discretion in making this finding.

As another ground for claiming duress, McCright cites "empty inducements" to enter the plea, such as the prosecutor's agreement not to charge McCright's father or to oppose the return of seized firearms registered in the father's name. But it appears from the record that *McCright proposed these additional terms*, not the prosecutor.

Finally, McCright contends he entered his plea under the duress caused by the prosecutor's threat to add a child endangerment charge. We disagree. McCright testified he was independently aware that having children around a drug operation "could be problematic" and that "they might try to take [his] kid." Turner testified to her experience with prosecutors commonly adding child endangerment charges. And the trial court, drawing on its considerable experience, observed that prosecutors "frequently" add child endangerment charges when they learn "a kid had been" in the "dangerous environment[ ]" created by an extraction operation. In this vein, the court noted that a prosecution witness was prepared to testify that McCright's "daughter was allowed to be there near this cooking environment." Thus, although the trial court recognized McCright may have been "under pressure because he loves his daughter," the court noted that defendants face similar dilemmas "all the time."

On balance, although McCright undoubtedly faced a difficult decision, the trial court did not abuse its discretion in finding he failed to prove by clear and convincing evidence that the potential addition of a child endangerment charge caused him to give his plea under duress.

## II. Factual Basis for Guilty Plea

As a separate challenge, McCright contends the trial court failed to establish an adequate factual basis for his guilty plea.[10]  We disagree.

### A. Background

A more comprehensive factual summary of the plea hearing is set forth in Discussion part I.A.1, which we need not repeat here in full.  Suffice to say, after some back-and-forth with the trial court, McCright ultimately responded "[y]es" when asked if the factual basis for his guilty plea—as set forth in the change of plea form—was that he "unlawfully manufactured THC extract."  Turner similarly responded "[y]es" when the court asked if she "concur[red] in . . . the factual basis . . . ."

As also noted, Turner attested in the plea form that she "personally read and explained . . . the entire contents of th[e] plea form" to McCright, and "discussed all charges and possible defenses with" him.  The trial court confirmed with McCright at least four times during the plea hearing that he had gone over the form with Turner.

At the end of the hearing, the trial court expressly found "there is a factual basis" for McCright's guilty plea.

### B. Legal Principles

Section 1192.5 provides that if the trial court approves a negotiated plea, it must "cause an inquiry to be made of the defendant to satisfy itself

---

10    The Attorney General argues McCright forfeited this challenge by failing to raise it in the trial court.  However, the California Supreme Court has held that although "[w]aiver and forfeiture principles are appropriately applied to most kinds of trial error, . . . their application in the present context would be inappropriate, given the prophylactic purpose behind the factual basis requirement . . . ." (*People v. Palmer* (2013) 58 Cal.4th 110, 116 (*Palmer*).)  Accordingly, we will address McCright's claim on the merits.

that the plea is freely and voluntarily made, and that there is a factual basis for the plea." " 'The purpose of the requirement is to protect against the situation where the defendant, although he realizes what he has done, is not sufficiently skilled in law to recognize that his acts do not constitute the offense with which he is charged. [Citation.] Inquiry into the factual basis for the plea ensures that the defendant actually committed a crime at least as serious as the one to which he is willing to plead.' " (*People v. French* (2008) 43 Cal.4th 36, 50.)

"[T]he trial court must garner information regarding the factual basis either from the defendant or defense counsel." (*People v. Holmes* (2004) 32 Cal.4th 432, 442 (*Holmes*).) "If the trial court examines the defendant regarding the factual basis for the plea, the court may have the defendant describe the conduct that gave rise to the charge [citation], or may question the defendant regarding the detailed factual basis described in the complaint or written plea agreement." (*Ibid*.) The court need not "question the defendant personally about each element in the charged offense, nor . . . believe that the defendant is guilty." (*Holmes*, at p. 440; see *People v. Watts* (1977) 67 Cal.App.3d 173, 180 (*Watts*).)

Alternatively, the trial court may accept a stipulation from defense counsel that an adequate factual basis exists. (*Holmes*, *supra*, 32 Cal.4th at p. 442; *Palmer*, *supra*, 58 Cal.4th at p. 118.) When this occurs, the " 'better approach' . . . is for counsel's stipulation" to refer to "a particular document that provides an adequate factual basis" (*Palmer*, at p. 118), "such as a complaint, police report, preliminary hearing transcript, probation report, grand jury transcript, or written plea agreement" (*Holmes*, at p. 442). But "while inclusion of such reference in the stipulation is *desirable*," it is *not required* so long as "the plea colloquy reveals that the defendant has

26

discussed the elements of the crime and any defenses with his or her counsel and is satisfied with counsel's advice." (*Palmer*, at p. 118, italics added.)

" '[A] trial court possesses wide discretion in determining whether a sufficient factual basis exists for a guilty plea. The trial court's acceptance of the guilty plea, after pursuing an inquiry to satisfy itself that there is a factual basis for the plea, will be reversed only for abuse of discretion.' " (*Palmer*, *supra*, 58 Cal.4th at pp. 118-119.)

## C. Analysis

We conclude the trial court undertook a sufficient inquiry before finding there existed an adequate factual basis for McCright's guilty plea. First, the court "question[ed] [McCright] regarding the detailed factual basis described in the . . . written plea agreement." (*Holmes*, *supra*, 32 Cal.4th at p. 442.) Specifically, McCright confirmed that he "unlawfully manufactured THC extract," as set forth in the plea form. Second, the court "accept[ed] a stipulation from counsel that a factual basis for the plea exist[ed]" (*Palmer*, *supra*, 58 Cal.4th at p. 118), and the record shows McCright had consulted with Turner regarding the charges, defenses, and consequences of his guilty plea. Although the better practice would have been for Turner to base her stipulation on a specific document, the trial court did not abuse its discretion by accepting the stipulation without Turner having done so. (*Ibid.*)

We are not persuaded by any of McCright's challenges to the trial court's finding that a factual basis existed. As to his claim that the court erred by not "ask[ing] [McCright] whether he did what was described in the complaint, as happened in *Holmes*[, *supra*, 32 Cal.4th at p. 436]," the claim fails because that is only one of the methods by which the trial court may satisfy its duty of inquiry. Here, the trial court undertook *two* other approved methods.

27

McCright also contends the factual basis was not sufficiently detailed because it did not establish the elements that McCright engaged in *chemical* extraction of THC, or that he "knew of the substance's nature or character as a controlled substance." But the court's inquiry need not establish the factual basis on an element-by-element basis. (*Holmes, supra,* 32 Cal.4th at p. 440; *Watts, supra,* 67 Cal.App.3d at p. 180.) Thus, for example, the defendant's statement in *People v. Calderon* (1991) 232 Cal.App.3d 930 that "he intentionally tried to kill someone constituted an adequate factual basis for attempted murder," even though the trial court "did not ask him if he did so with malice." (*Id.* at p. 935; see *Holmes,* at pp. 441, 443 & fn. 9 [citing *Calderon* with approval].) McCright's acknowledgment that he "unlawfully manufactured THC extract" was similarly adequate.

## DISPOSITION

The judgment is affirmed.

HALLER, Acting P. J.

WE CONCUR:


AARON, J.


GUERRERO, J.